## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FELICIA ROCHE,<br><br>     *Plaintiff*,<br><br> v.<br><br>TEMPLE UNIVERSITY – OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION,<br><br>     *Defendant*. | CIVIL ACTION NO.<br><br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

### I. INTRODUCTION

Plaintiff, Felicia Roche, brings this action against her former employer, Temple University – Of The Commonwealth System Of Higher Education ("Defendant" or "Temple"). Defendant's sex discriminatory and retaliatory conduct against Plaintiff violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); the Pennsylvania Human Relations Act, as amended, 43 P.S. § 951, *et seq.* ("PHRA"); and, the Philadelphia Fair Practices Ordinance, as amended, Phila. Code § 9-1100, *et seq.* ("PFPO"). Plaintiff seeks all damages allowable under law, including economic, compensatory, punitive damages, attorneys' fees and costs, and all other relief that this Court deems appropriate.

### II. PARTIES

1. Plaintiff, Felicia Roche, is an individual and a citizen of the Commonwealth of Pennsylvania. She currently resides in Glenside, Pennsylvania.

2. Plaintiff is female.

3.      Defendant Temple University – Of The Commonwealth System Of Higher Education is an institution of higher education with its principal place of business located at 1801 N. Broad St., Philadelphia, Pennsylvania 19122.

4.      Defendant is engaged in an industry affecting interstate commerce and regularly conducts business in the Commonwealth of Pennsylvania and in the City of Philadelphia.  Defendant also employs residents of the Commonwealth of Pennsylvania and the City of Philadelphia.

5.      At all times material hereto, Defendant employed more than fifteen (15) employees.

6.      At all times material hereto, Defendant acted by and through its authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Defendant and in furtherance of Defendant's business.

7.      At all times material hereto, Defendant acted as an employer within the meaning of the statutes which form the basis of this matter.

8.      At all times material hereto, Plaintiff was an employee of Defendant within the meaning of the statutes which form the basis of this matter.

III.    **JURISDICTION AND VENUE**

9.      The causes of action which form the basis of this matter arise under Title VII, the PHRA, and the PFPO.

10.     The District Court has jurisdiction over Count I (Title VII) pursuant to 42 U.S.C. § 2000e-5 and 28 U.S.C. § 1331.

11.     The District Court has supplemental jurisdiction over Count II (PHRA) pursuant to 28 U.S.C. § 1367.

12.    The District Court has supplemental jurisdiction over Count III (PFPO) pursuant to 28 U.S.C. § 1367.

13.    Venue is proper in the District Court under 28 U.S.C. §1391(b) and 42 U.S.C. § 2000e-5(f) because a substantial part of the events or omissions giving rise to the claims have occurred within this District.

14.    On or about March 15, 2024, Plaintiff filed a Complaint of Discrimination with the Philadelphia Commission on Human Relations ("PCHR"), complaining of acts of discrimination and retaliation alleged herein.  This Complaint of Discrimination was cross-filed with the Equal Employment Opportunity Commission ("EEOC").  Attached hereto, incorporated herein, and marked as **Exhibit "1"** is a true and correct copy of the PCHR Complaint of Discrimination (with personal identifying information redacted).

15.    On or about December 15, 2025, the EEOC issued to Plaintiff a Notice of Right to Sue for her Complaint of Discrimination.  Attached hereto and marked as **Exhibit "2"** is a true and correct copy of the Notice of Right to Sue (with personal identifying information redacted).

16.    On or about February 2, 2026, the PCHR issued Plaintiff a Dismissal and Notice of Rights regarding her Complaint of Discrimination.  Attached hereto, and marked as **Exhibit "3"** is a true and correct copy of the Dismissal and Notice of Rights (with personal identifying information redacted).

17.    Plaintiff has fully complied with all administrative prerequisites for the commencement of this action.

IV.    <u>**FACTUAL ALLEGATIONS**</u>

12.    Plaintiff began working at Defendant on or about May 12, 2023.

13.    At all times material hereto, Plaintiff worked at Kenderton School in Philadelphia, Pennsylvania, through her employment with Defendant's Philadelphia Health and Safe Schools ("PHASeS") program.

14.    Plaintiff consistently performed her job duties in a highly competent manner.

15.    Plaintiff last held the position of Trauma Specialist.

16.    Plaintiff's job duties as Trauma Specialist included, *inter alia*, providing trauma-informed interventions and support to students at Kenderton School, conducting assessments and developing social services plans, and delivering training on trauma recovery strategies to school staff.

17.    Plaintiff last reported to Nili Gleaton ("Gleaton"), Managing Director, PHASeS.

18.    Gleaton reported to Mary Beth Hays ("Hays"), Director of PHASeS, and Hays reported to Nicolle Strand ("Strand"), Director of Center for Urban Bioethics at Defendant.

19.    Strand reported to Amy Goldberg ("Goldberg"), Dean of the Medical School at Defendant.

20.    Before reporting to Gleaton, Plaintiff reported to Hays.

21.    Shortly after Plaintiff was hired at Defendant, Mabari Byrd ("Byrd") (male), Trauma Specialist, began engaging in comments and conduct of a sexual nature toward Plaintiff.

22.    Byrd commented on Plaintiff's appearance.

23.     When Plaintiff was wearing her glasses, Byrd commented that Plaintiff was looking "all cute and studious."

24.     Byrd commented that Plaintiff's hair was very nice, and he wished he could run his hand through it.

25.     Byrd commented that Plaintiff looked nice.

26.     Byrd touched Plaintiff when he was around her, especially when laughing and speaking passionately about work.

27.     Byrd held Plaintiff's arm while speaking to her.

28.     Byrd walked up to Plaintiff, grabbed her arm, pulled her toward him, and whispered in her ear, so closely that his lips brushed her ear, and stated that the people they worked for could not handle him because he was a ram.

29.     Byrd came into Plaintiff's cubicle, and placed his arm around Plaintiff's neck and shoulders, and asked Plaintiff what she was working on while looking at her computer screen.

30.     On multiple occasions, Plaintiff requested that Byrd refrain from making any comments about her appearance and refrain from touching her.

31.     On August 3, 2023, in a phone call, following a team meeting, Byrd told Plaintiff that he "loved" how she spoke to Hays.

32.     In the above phone call, Byrd also told Plaintiff that he wished Plaintiff had looked across the table at him so that she could see the way he was staring at her because he wanted to "jump across the table" and "grab" Plaintiff and "kiss" her—to "kiss the shit out of [her]."

33.    Byrd additionally told Plaintiff that it "turned [him] on" to see Plaintiff call out Hays and talk to her the way Plaintiff did.

34.    Moreover, Byrd stated that he could tell Plaintiff took care of herself physically because he went onto her LinkedIn profile and saw photos of Plaintiff when she was in shape.

35.    Byrd also stated in the above phone call that, if Plaintiff had come into work looking like she looked in those photos, "there would have been a problem."

36.    Following the above, Plaintiff complained to Sabrinah Murbarak ("Murbarak"), Trauma Specialist, about Byrd's above comments to her, and stated that she did not feel comfortable being alone with Byrd.

37.    Following the above, in a text message to Byrd, Plaintiff stated that she was "disappointed" that he "sexualize[d] [her] leadership style."

38.    Plaintiff also stated that Byrd's comments were "extremely triggering for [her]."

39.    On August 15, 2023, Byrd asked to speak with Plaintiff and was persistent about it.

40.    When Plaintiff refused and Byrd asked her why, Plaintiff stated that, if he thought there was nothing inappropriate that he had done, then she really was uncomfortable speaking to him at that moment.

41.    On or about August 22, 2023, when Byrd saw Plaintiff at the student faculty center, he came over to her, got down on his knees in front of her, stated that he was sorry, and asked if Plaintiff would ever forgive him.

42.    On September 1, 2023, in a conversation with Byrd, Plaintiff stated that, following his inappropriate comments, she wanted to ensure that they had clear, professional boundaries because they still had to work together.

43.    Byrd stated in response to the above that he wanted to have a friendship with Plaintiff, but he stated that he did not know how to proceed, as he had told people about her rebuffing his advances, and that they warned him about Plaintiff, telling him that he should steer clear of her because he had worked too hard to get to where he was to let Plaintiff ruin it.

44.    Byrd made light of Plaintiff's discomfort around him and her wanting to set boundaries with him.

45.    Byrd commented that there should be trust and loyalty between Plaintiff and him.

46.    On September 8, 2023, in an email to Hays, Plaintiff requested a meeting with her and Strand.

47.    On September 11, 2023, in a meeting with Hays and Strand, Plaintiff complained of sex discrimination in connection with Byrd's unwanted sexual comments and conduct toward her.

48.    Plaintiff provided many of the examples contained in this Complaint regarding Byrd's behavior toward her.

49.    Plaintiff also stated in the above meeting that she was afraid to be around Byrd and alone in the same space as him because she was concerned that he was going to engage in further comments and conduct of a sexual nature toward her.

50.    Hays instructed Plaintiff to pull back from speaking in meetings and decrease feedback.

51.    Plaintiff understood Hays to be dismissive of Plaintiff's complaints and appeared to blame Plaintiff for Byrd's conduct.

52.    On September 12, 2023, in an email to Hays, Plaintiff stated: "I found myself in distress from the fear and discomfort of being alone in the same space as MB. I came to you to help manage what I have been managing on my own for months now."

53.    On September 12, 2023, following the above, in meeting with Hays, Strand, and Guthrie Conyngham ("Conyngham"), Human Resources, Plaintiff complained of sex discrimination in connection with Byrd's unwanted sexual comments and conduct toward her.

54.    Plaintiff was instructed to stay home until further notice.

55.    On September 14, 2023, in a phone call with Julie Brissette ("Brissette"), Senior Director, People Management, Plaintiff complained of sex discrimination in connection with Byrd's unwanted sexual comments and conduct toward her.

56.    In response to the above, Brissette stated that she was investigating Plaintiff's complaint, and asked Plaintiff to send her a copy of her text message exchanges with Byrd, which Plaintiff provided to Brissette following the phone call.

57.    Plaintiff did not receive any further communication from Brissette after the above phone call.

58.    On September 20, 2023, in a meeting with Hays and Strand, Strand stated that, as a result of the investigation into Plaintiff's complaints, Byrd was being disciplined but did not inform her of the specific nature of that discipline.

59. Hays indicated that Plaintiff was to blame for Byrd's conduct toward her.

60. Hays stated that Plaintiff always seemed to have a problem.

61. When Plaintiff asked if Byrd and Plaintiff could work at different schools, as Defendant routinely moved around Trauma Specialist employees, Hays stated that was not an option.

62. Plaintiff was visibly upset during the meeting.

63. On September 20, 2023, following the above, in an email from Strand, copying Hays, she summarized the above meeting and stated the following:

    a. Human Resources conducted an investigation, which was now closed;

    b. They could not "reveal the disposition of that investigation, due to confidentiality," but could tell Plaintiff what her next steps were and how Plaintiff should proceed;

    c. Plaintiff would be remaining at the same school as and working with Byrd;

    d. Byrd and Plaintiff have been instructed to "maintain strict professional workplace boundaries;" and

    e. Plaintiff should report any further issues.

64. Strand falsely stated that the above plan met Plaintiff's "desired outcome."

65. On September 21, 2023, Plaintiff returned to work and was forced to continue to work with Byrd.

66. Following Plaintiff's sex discrimination complaints, Plaintiff was treated differently and worse, and in a more hostile and dismissive manner than male and/or noncomplaining employees were treated. Examples of the same include, without limitation:

    a.  Plaintiff's performance was unjustly criticized, despite no performance issues before her complaints.

    b.  Hays asked Plaintiff if she "ever smile[d]."

67.    Plaintiff received no further response to or communication regarding her sex discrimination complaints.

68.    Defendant failed to investigate Plaintiff's sex discrimination complaints.

69.    Defendant failed to take any action to remedy or prevent the sex discrimination and retaliation to which Plaintiff was subjected.

70.    In late September 2023, Plaintiff began reporting to Gleaton, after Gleaton was promoted by Hays from Trauma Specialist to Directing Manager.

71.    Gleaton commented that Byrd was her "work husband."

72.    On October 26, 2023, in a meeting with Gleaton, she unjustly criticized Plaintiff's performance, stated that Plaintiff was not speaking up enough at meetings, and stated that Plaintiff's demeanor was disrespectful.

73.    On October 27, 2023, in an email from Gleaton, copying Hays, Strand, and Conyngham, she unjustly criticized Plaintiff's performance, and stated the following: "The dissatisfaction with your performance stems from your unwillingness to provide clearer communication as that is the expectation and to remain fully engaged.  In addition, your lack of constructive contributions to the team meetings, respectful interactions with leadership and some team members, has also been noted as part of your professional conduct."

74.     On October 27, 2023, in a response email to Gleaton, Plaintiff rebutted the unjust criticisms and asked Gleaton to provide an example of when Plaintiff was unwilling to provide clear communication.

75.     Plaintiff also stated in the above response email to Gleaton that she looked forward to further conversations with her regarding how Plaintiff shares information with her, and that Plaintiff would do her best to provide her with insight on what was happening at the school.

76.     Plaintiff received no response to her above email.

77.     On October 31, 2023, in a meeting with Gleaton, Defendant placed Plaintiff on a Performance Improvement Plan ("PIP").

78.     Plaintiff's performance did not warrant a PIP.

79.     The PIP was scheduled to last ninety (90) days.

80.     The PIP stated that Plaintiff's "overall disposition has been unfavorable, affecting [her] ability to actively participate and engage during team meetings and other team-related activities."

81.     The PIP stated that Plaintiff "exhibited a lack of positive contributions to the team."

82.     Plaintiff understood the above unjust criticisms to be in reference to and because of Plaintiff's sex discrimination complaints.

83.     Plaintiff rebutted the unjust criticisms.

84.     Plaintiff stated that she had been doing what Hays had instructed her to do, following her sexual harassment complaints, which was to pull back from speaking in meetings and decrease feedback.

85.    Plaintiff stated that she had not withheld information from Gleaton.

86.    Gleaton stated that she had no way of evaluating Plaintiff's work, as she did not have time to come observe Plaintiff or speak with Plaintiff's co-workers about how Plaintiff was doing.

87.    When Plaintiff asked Gleaton how she thought Plaintiff was doing, Gleaton falsely stated that she had observed her at her desk doing nothing.

88.    Plaintiff asked for a meeting with Human Resources.

89.    Gleaton told Plaintiff that she could contact Human Resources herself since she liked reaching out to them so much.

90.    Plaintiff understood the above comment to be in reference to and because of Plaintiff's sex discrimination complaints.

91.    On November 1, 2023, in an email to Conyngham, copying Hays and Strand, Plaintiff summarized her above meeting with Gleaton and rebutted the unjust criticisms.

92.    Plaintiff also stated in the above email that she had arrived to work on time, stayed late, and worked hard, and that it was upsetting and concerning to Plaintiff that she was being accused of being uncooperative and doing nothing, which was wrong.

93.    Plaintiff also noted that Gleaton told her that she could contact Human Resources herself since she liked reaching out to them so much, which she understood to be in reference to and because of her sex discrimination complaints.

94.    In response to her above email, Conyngham instructed Plaintiff to contact Steve Hoffman ("Hoffman") (male), Human Resources, which Plaintiff did.

95.    On November 8, 2023, in an email from Hoffman, he stated that the PIP was developed by Plaintiff's supervisor, and that Plaintiff should discuss any questions with her supervisor, the department head, or the center director.

96.    On November 9, 2023, in a meeting with Gleaton, Byrd, and Deanna Bredell ("Bredell") (female), Principal of Kenderton School, Bredell stated that, until Gleaton, Byrd, and Plaintiff figured out their internal issues, she no longer wanted them working at the school.

97.    Bredell also stated in the above meeting that she had been "rocking" with Byrd for three (3) years and did not understand why things had now changed.

98.    Plaintiff was instructed to leave the meeting while Gleaton, Byrd, and Bredell continued to meet.

99.    On November 9, 2023, following the above, in an email from Hays to Byrd and Plaintiff, copying Gleaton and Strand, Byrd and Plaintiff were instructed to work remotely the following day, November 10, 2023.

100.    Hays stated that this "leave" was "a temporary measure intended to provide a brief pause."

101.    Hays stated that the intention was to reconvene the following week and have "a constructive discussion about recent events."

102.    Hays stated that she would keep them "updated with next steps."

103.    On November 13, 2023, in an email from Gleaton, she asked Plaintiff to provide her with "a brief statement of [her] account of what happened on Thursday 11/9 with Principal Bredell."

104.    Gleaton also stated in the above email that the hope was they would have an opportunity to meet with Bredell that week.

105.    On November 13, 2023, in a response email to Gleaton, Plaintiff summarized what happened on November 9, 2023.

106.    Plaintiff continued to work remotely as instructed.

107.    On November 16, 2023, in an email to Hays, Plaintiff asked for an update regarding the work situation.

108.    On November 16, 2023, in a response email from Hays, she stated that the issue was still being investigated by Human Resources and Bredell, and that they were in the process of gathering all the necessary information.

109.    On or about November 16, 2023, in a phone call with Kiana House ("House"), Acquisition Specialist, Plaintiff complained of sexual harassment and retaliation following her sexual harassment complaints, and asked if there were any other positions into which Plaintiff could transfer.

110.    House stated that Plaintiff should speak with Hoffman, that she would contact him on Plaintiff's behalf, and that Hoffman would contact her.

111.    House instructed Plaintiff to hold tight and not make any decisions until she spoke with Hoffman.

112.    Plaintiff did not receive any communication from Hoffman regarding open positions.

113.    On November 17, 2023, Plaintiff applied for the posted Director, Mental Health Counseling position.

114.    Plaintiff was qualified for the above position.

115.    On November 17, 2023, Plaintiff applied for the posted Academic Advisor I position.

116.    Plaintiff was qualified for the above position.

117.    On November 17, 2023, Plaintiff applied for the posted Program Coordinator, Student Conduct position.

118.    Plaintiff was qualified for the above position.

119.    On November 17, 2023, Plaintiff applied for the posted Assistant Health and Safety Specialist position.

120.    Plaintiff was qualified for the above position.

121.    On November 17, 2023, Plaintiff applied for the posted Assistant Director, Admissions position.

122.    Plaintiff was qualified for the above position.

123.    Other than automated acknowledgement emails, Plaintiff received no communication regarding her application for any of the posted positions for which she was qualified and had applied.

124.    On November 22, 2023, in an email from Gleaton, Plaintiff was asked to attend a meeting with her on November 27, 2023.

125.    On November 27, 2023, in a meeting with Hays, Strand, and Gleaton, Defendant terminated Plaintiff's employment, effective immediately.

126.    Gleaton stated that Plaintiff was being terminated due to the result of the alleged investigation that was conducted following the meeting held on November 9, 2023.

127.    On November 27, 2023, Plaintiff received a letter signed by Gleaton, which stated that Kenderton School terminated Plaintiff's work relationship between it and Defendant's PHASeS program.

128.    On November 27, 2023, Defendant terminated Byrd's employment.

129.    On November 27, 2023, following the above, in a meeting with Deirdre L. Culbreath-Walton ("Culbreath-Walton") (female), Vice President, Employee Relations, Plaintiff, and Byrd, Culbreath-Walton stated that there was an investigation about the incident that occurred with Bredell.

130.    Plaintiff asked for the details and the results of the alleged investigation that was conducted.

131.    Culbreath-Walton stated that she did not know details but would look into it and get back to them.

132.    Culbreath-Walton encouraged Plaintiff to apply for positions at Defendant and report her experience to Ethics and Compliance and send her a written statement of what Plaintiff had been subjected to during her employment.

133.    On November 28, 2023, in an email to Culbreath-Walton, Plaintiff sent her resume, information on the Director, Mental Health Counseling position Plaintiff had applied for, and Plaintiff's qualifications for the Director, Mental Health Counseling position.

134.    Plaintiff stated that she would be preparing and sending Culbreath-Walton the written statement as discussed with her the day before.

135.    On November 29, 2023, in an email to Culbreath-Walton, Plaintiff sent her written statement.

136.    On December 1, 2023, in a phone call to Defendant's Ethics and Compliance Team, Plaintiff complained of sex discrimination, including sexual harassment, and retaliation based on her sex discrimination complaints, including her termination.

137.    On December 5, 2023, in a phone call with Culbreath-Walton, she stated that she still did not understand why Plaintiff had been terminated.

138.    Culbreath-Walton also told Plaintiff she would following up again after she met with her team.

139.    Plaintiff followed up numerous times with Culbreath-Walton but did not receive a response from her.

140.    On January 3, 2024, in a phone call with Culbreath-Walton, she stated that there was nothing that she could do to get Plaintiff her job back.

141.    Culbreath-Walton also stated that she believed that Plaintiff had been wrongfully terminated.

142.    Culbreath-Walton additionally stated that she would have Hoffman contact Plaintiff.

143.    On January 9, 2024, in a phone call with Hoffman, he stated to Plaintiff that Defendant had received Plaintiff's statement, that her complaints were being investigated, and that there was nothing further needed from Plaintiff.

144.    Plaintiff received no further response to or communication from Defendant regarding her sex discrimination and retaliation complaints.

145.    Plaintiff received no explanation, including the selection criteria, as to why she was being terminated and male and/or non-complaining employees were retained.

146.     At the time of Plaintiff's termination, the following employees, in addition to Plaintiff, reported directly to Gleaton:

    a.   Sabrinah Murbarak, Trauma Specialist;

    b.   Jessica Drass, Trauma Specialist;

    c.   Brandon Brown, Trauma Specialist;

    d.   Donisha Burke, Trauma Specialist;

    e.   Mabari Byrd, Trauma Specialist.

147.     Plaintiff was qualified for the above employees' positions.

148.     Plaintiff was provided with no opportunity to remain employed with Defendant.

149.     Defendant replaced Plaintiff with and assigned her job duties to male employees and/or employees who had not engaged in protected activity.

150.     Plaintiff was more qualified and experienced to perform her job duties than the non-complaining and/or male employees to whom her job duties were assigned and with whom Defendant replaced her.

151.     Defendant retained male employees and/or employees who had not engaged in protected activity in positions for which Plaintiff was more qualified.

152.     Defendant's conduct and comments evidence a bias against female and/or non-complaining employees.

153.     Defendant terminated Plaintiff's employment because of her sex and/or because of her complaints of sex discrimination.

154.    Defendant failed to interview or select Plaintiff for the Director, Mental Health Counseling position, for which Plaintiff was qualified and had applied, because of her sex and/or because of her complaints of sex discrimination.

155.    Defendant failed to interview or select Plaintiff for the Academic Advisor I position, for which Plaintiff was qualified and had applied, because of her sex and/or because of her complaints of sex discrimination.

156.    Defendant failed to interview or select Plaintiff for the Program Coordinator, Student Conduct position, for which Plaintiff was qualified and had applied, because of her sex and/or because of her complaints of sex discrimination.

157.    Defendant failed to interview or select Plaintiff for the Assistant Health and Safety Specialist position, for which Plaintiff was qualified and had applied, because of her sex and/or because of her complaints of sex discrimination.

158.    Defendant failed to interview or select Plaintiff for the Assistant Director, Admissions position, for which Plaintiff was qualified and had applied, because of her sex and/or because of her complaints of sex discrimination.

159.    Defendant failed to select Plaintiff for any open position for which she was qualified because of her sex and/or because of her complaints of sex discrimination.

160.    Plaintiff's sex was a motivating and/or determinative factor in connection with Defendant's discriminatory and retaliatory treatment of Plaintiff, including but not limited to, its subjecting her to a hostile work environment, failing to select her for open positions for which she was qualified, placing her on a PIP, subjecting her to an investigation, and terminating her employment.

161.    Plaintiff's complaints of sex discrimination were a motivating and/or determinative factor in connection with Defendant's discriminatory and retaliatory treatment of Plaintiff, including but not limited to, its subjecting her to a hostile work environment, failing to select her for open positions for which she was qualified, placing her on a PIP, subjecting her to an investigation, and terminating her employment.

162.    The discriminatory and retaliatory conduct of Defendant, as alleged herein, was severe and/or pervasive enough to make a reasonable person believe that the conditions of employment had been altered and that a hostile work environment existed, and made Plaintiff believe that the conditions of employment had been altered and that a hostile work environment existed.

163.    Defendant has not provided legitimate, non-discriminatory reasons for subjecting Plaintiff to the conduct she endured, including but not limited to her termination of employment.

164.    Defendant failed to investigate Plaintiff's complaints of sex discrimination.

165.    Defendant failed to take appropriate corrective or preventive measures in connection with the sex discrimination to which Plaintiff was subjected and of which she complained.

166.    Rather than investigating, correcting, or taking measures to prevent the sex discrimination of which Plaintiff complained, Defendant retaliated against Plaintiff, including by subjecting her to a hostile work environment, failing to select her for open positions for which she was qualified, placing her on a PIP, subjecting her to an investigation, and terminating her employment.

167.    The retaliatory actions taken against Plaintiff after complaining of sex discrimination would have discouraged a reasonable employee from complaining about unlawful discrimination.

168.    As a direct and proximate result of the discriminatory and retaliatory conduct of Defendant, Plaintiff has in the past incurred, and may in the future incur, a loss of earnings and/or earning capacity, loss of benefits, pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures, the full extent of which is not known at this time.

169.    Defendant acted with malice, reckless indifference and/or deliberate indifference to Plaintiff's protected rights, and its conduct warrants the imposition of punitive damages.

170.    Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

## <u>COUNT I – TITLE VII</u>

171.    Plaintiff incorporates herein by reference the paragraphs above, as if set forth herein in their entirety.

172.    By committing the foregoing acts of discrimination and retaliation against Plaintiff, Defendant violated Title VII.

173.    Said violations were done with malice and/or reckless indifference to Plaintiff's protected rights, and warrant the imposition of punitive damages.

174. As a direct and proximate result of Defendant's violations of Title VII, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

175. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

176. No previous application has been made for the relief requested herein.

## COUNT II – PHRA

177. Plaintiff incorporates herein by reference the paragraphs above, as if set forth herein in their entirety.

178. By committing the foregoing acts of discrimination and retaliation against Plaintiff, Defendant violated the PHRA.

179. As a direct and proximate result of Defendant's violations of the PHRA, Plaintiff has sustained the injuries, damages, and losses set forth herein and has incurred attorneys' fees and costs.

180. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory and retaliatory acts unless and until the Court grants the relief requested herein.

181. No previous application has been made for the relief requested herein.

## COUNT III – PFPO

182. Plaintiff incorporates herein by reference the paragraphs above, as if set forth herein in their entirety.

183.    By committing the foregoing acts of discrimination and retaliation against Plaintiff, Defendant violated the PFPO.

184.    Defendant acted willfully and intentionally, and with malice and/or deliberate indifference to Plaintiff's rights, thereby warranting the imposition of punitive damages.

185.    As a direct and proximate result of Defendant's violations of the PFPO, Plaintiff has sustained the injuries, damages, and losses set forth herein and has incurred attorney's fees and costs.

186.    Plaintiff is now suffering and will continue to suffer irreparable injuries and monetary damages as a result of Defendant's discriminatory and retaliatory acts unless and until the Court grants the relief requested herein.

187.    No previous application has been made for the relief requested herein.

## **RELIEF**

WHEREFORE, Plaintiff seeks damages and legal and equitable relief in connection with Defendant's improper conduct, and specifically prays that the Court grant the following relief to the Plaintiff by:

(a)    declaring the acts and practices complained of herein to be in violation of Title VII;

(b)    declaring the acts and practices complained of herein to be in violation of the PHRA;

(c)    declaring the acts and practices complained of herein to be in violation of the PFPO;

(d)    enjoining and permanently restraining the violations alleged herein;

(e)    entering judgment against Defendant and in favor of the Plaintiff in an amount to be determined;

(f)    awarding compensatory damages to make the Plaintiff whole for all lost earnings, earning capacity, and benefits, past and future, which Plaintiff has suffered or may suffer as a result of Defendant's unlawful conduct;

(g)    awarding compensatory damages to Plaintiff for past and future pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures, which Plaintiff has suffered or may suffer as a result of Defendant's unlawful conduct;

(h)    awarding punitive damages to Plaintiff under Title VII and the PFPO;

(i)    awarding Plaintiff such other damages as are appropriate under Title VII, the PHRA, and the PFPO;

(j)    awarding Plaintiff the costs of suit, expert fees, and other disbursements, and reasonable attorneys' fees; and

(k)    granting such other and further relief as this Court may deem just, proper, or equitable including other equitable and injunctive relief providing restitution for past violations and preventing future violations.

**CONSOLE MATTIACCI LAW, LLC**

Dated: March 6, 2026        BY:    */s/ Jonathan D. Gilman*
                                                Jonathan D. Gilman, Esq.
                                                1525 Locust Street, 9th Floor
                                                Philadelphia, PA 19102
                                                (215) 545-7676

                                                *Attorneys for Plaintiff,*
                                                *Felicia Roche*